**Earl R. FOSTER, Appellant,**

v.

**DRAVO CORPORATION, Appellee.**

**No. 73–1083.**

United States Court of Appeals, Third Circuit.

Argued Oct. 11, 1973.

Decided Dec. 26, 1973.

Harlington Wood, Jr., Asst. Atty. Gen., Richard L. Thornburgh, U. S. Atty., Jean A. Staudt, Robert E. Kopp, Appellate Section, Civil Div. Dept. of Justice, Washington, D. C., for appellant.

Charles R. Volk, Robert H. Shoop, Jr., Thorp, Reed & Armstrong, Pittsburgh, Pa., for appellee.

Before HASTIE, VAN DUSEN and ADAMS, Circuit Judges.

### OPINION OF THE COURT

ADAMS, Circuit Judge.

The issue in this case is whether under the Selective Service Act of 1967 an employee is entitled to full vacation benefits for the years he entered and returned from military service, under the terms of a collective bargaining agreement that conditioned the award of such benefits on the receipt of earnings during 25 weeks of the previous year.

Earl R. Foster, an employee of the Dravo Corporation since August 5, 1965, received a military leave of absence beginning on March 6, 1967. Shortly after completing his military obligation, he returned to the employ of Dravo on October 7, 1968. Foster thus worked for Dravo a total of nine weeks in 1967 and thirteen weeks in 1968.

The collective bargaining agreement between Dravo and Foster's bargaining representative, Industrial Union of Marine and Ship Building Workers of America, Local 61, requires that an employee, in order to qualify for full vacation benefits, "must have received earnings in at least twenty-five (25) work weeks in the twelve (12) months preceding the current December 31st." [1]

The language and the overall scheme and purpose of the reemployment provisions of the Selective Service Act of 1967, 50 U.S.C. App. § 459, are determinative of the present dispute about a reemployed veteran's claim to civilian

---

1. Article XIV, section 2 of the collective bargaining agreement recites the conditions an employee must fulfill in order to receive vacation benefits. The relevant part of this section reads as follows:

   In order to qualify for the foregoing vacations, an employee who has been continuously employed for two (2) or more December 31st and has seniority on the current December 31st must have received earnings in at least twenty-five (25) work weeks in the twelve (12) months immediately preceding the current December 31st.

   It is only on the basis of Foster's failure to meet the twenty-five weeks of work requirement that Dravo challenges his eligibility for vacation benefits.

vacation pay on account of time spent in military service.

Section 459(b) requires that a returning veteran "be restored to the position vacated for military service" or, as an acceptable alternative, "to a position of like seniority, status, and pay." Because the parties have stipulated that appellee was restored "to the position [he had] vacated," the mandate of § 459(b) has been satisfied and there is no need in this case to consider the allowable alternative of restoration "to a position of like seniority, status, and pay."

Rather, the controversy here arises out of the interpretation and application of § 459(c), which reads as follows:

> (c)(1) Any person who is restored to a position in accordance with the provisions of paragraph  *  *  *
>
> (B) of subsection (b) shall be considered as having been on furlough or leave of absence during his period of training and service in the armed forces, shall be so restored *without loss of seniority*, shall be entitled to participate in insurance or *other benefits* offered by employer pursuant to established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time such person was inducted into such forces, and shall not be discharged from such position without cause within one year after such restoration.
>
> (2) It is declared to be the sense of the Congress that any person who is restored to a position in accordance with the provisions of paragraph  *  *  *  (B) of subsection (b) should

be so restored in such manner as to give him such status in his employment as he would have enjoyed if he had continued in such employment continuously from the time of his entering the armed forces until the time of his restoration to such employment. (Emphasis added)

Subsections (c)(1) and (2) require that job seniority shall not be adversely affected by military leave, and that, for the purpose of various "other benefits" enjoyed by employees under the employer's rules and practices, the reemployed veteran shall be treated as "having been on furlough or leave of absence" during his military service.

## I.

Much in this case turns on whether a particular incident of the employment relationship is regarded as falling under the "seniority" or the "other benefits" language of subsection (c)(1).

There is general agreement as to the differing import of the "seniority" and "other benefits" language of subsection (c)(1). If it is length of service that determines the amount or kind of emolument a returning veteran is to receive, it must be considered a perquisite of "seniority" and the veteran's time spent in the military is included when computing his length of service.[2] If, on the other hand, the particular incident of employment does not accrue simply because of length of service, it must be considered a "benefit" other than one based on seniority, and the returning veteran is entitled to the advantages claimed only if he has met the other conditions.[3]

---

2. *See, e. g.*, Accardi v. Pennsylvania R.R., 383 U.S. 225, 86 S.Ct. 768, 15 L.Ed.2d 717 (1966); Tilton v. Missouri Pac. R.R., 376 U.S. 169, 84 S.Ct. 595, 11 L.Ed.2d 590 (1964). In Fishgold v. Sullivan Drydock & Repair Corporation, 328 U.S. 275, 66 S.Ct. 1105, 90 L.Ed. 1230, the court enunciated the "escalator principle" which assures that the veteran does not suffer because of his military service in terms of his length of service vis-a-vis fellow employees who do

not serve in the armed forces. "[The veteran] does not step back on the seniority escalator at the point he stepped off. He steps back on at the precise point he would have occupied had he kept his position." *Id.* at 284–285, 66 S.Ct. at 1111.

3. *See, e. g.*, Kasmeier v. Chicago, R.I. & Pac. R.R., 437 F.2d 151 (10th Cir. 1971); Dougherty v. General Motors Corp., 176 F. 2d 561 (3d Cir. 1949).

■ It is in determining whether a benefit is conditioned simply on length of service or something more that difficulty is encountered. In deciding whether the "seniority" or "other benefits" language of subsection (c)(1) governs, we are guided by the Supreme Court's instructions in Accardi v. Pennsylvania Railroad Co.[4] to refrain from unreflective acceptance of the "labels" used by the employer and the union in describing the types of benefits contained in the collective bargaining agreement.[5]

## II.

*Accardi* has spawned a group of lower court opinions that, Foster contends, counsel reliance on strictly literal interpretations of the words of the collective bargaining agreement in determining whether a particular benefit, such as vacations, is to be considered a perquisite of "seniority" or to be placed in the category of "other benefits." In *Accardi* itself, which dealt with the issue whether time spent in the military should be included in computing an employee's severance pay, the Supreme Court did point out that under the contract there "bizarre results" were possible: "an employee [could] . . . receive credit for a whole year of 'compensated service' by working a mere seven days."[6]

The Court in making this illustrative statement, however, was not suggesting that so long as any conceivable, although possibly unrealistic, reading of an agreement requires only a minimal work requirement in order to be entitled to a particular benefit, such benefit must be regarded as a prerogative of seniority.[7] The language in *Accardi* following the reference to the "bizarre result," indicates that the Court, instead, reached its conclusion much in the same way an arbitrator does, by considering not only the words of the agreement but also the meaning with which those words are imbued by the general and specific industrial relations milieu:

> The use of the label "compensated service" cannot obscure the fact that the *real nature* of those payments was compensation for loss of jobs. And the cost to an employee of losing his job is not measured by how much more work he did in the past—no matter how calculated—but by the rights and benefits he forfeits by giving up his job. Among employees who worked at the same jobs in the same craft and class the number and value of the rights and benefits increased in proportion to the amount of seniority, and it is only natural that those with seniority should receive the highest allowance since they were giving up more rights and benefits than those with less seniority.[8] (Emphasis added)

Undoubtedly the fact that the contract in *Accardi* had an express provision defining "compensated service" contributed, in some manner, to the result the Court reached. But it certainly would be ironic for the Supreme Court to direct lower courts to abandon the use of labels when deciding whether a benefit is a prerogative of seniority and at the same time direct that they replace such use with a strained and niggardly analysis of the terms of collective bargaining agreements.

Foster suggests, however, that this Court, in Hoffman v. Bethlehem Steel Corporation,[9] has interpreted the instructions in *Accardi* to require courts to base their decisions in § 459 cases on unusual constructions of labor con-

---

4. 383 U.S. 225, 86 S.Ct. 768, 15 L.Ed.2d 717 (1966).

5. *See id.* at 229–230, 86 S.Ct. 768.

6. 383 U.S. at 230, 86 S.Ct. at 772.

7. *See* Haggard, Veterans' Reemployment Rights and the "Escalator Principle," 51 B.

U.L.Rev. 539, 571 (1971) (hereinafter cited as Haggard); Note, The Supreme Court, 1965 Term, 80 Harv.L.Rev. 91, 149 (1966).

8. 383 U.S. at 230, 86 S.Ct. at 772.

9. 477 F.2d 860 (3d Cir., 1973).

tracts.[10] The agreements in *Hoffman* granted to an employee one-half of a supplemental unemployment benefit (SUB) credit unit for each week in which he had "hours of work for the company." Thus, like the agreement in *Accardi*, the *Hoffman* contract contained an express provision that permitted a "bizarre result;" that is, an employee who worked one hour each week could accrue as much SUB credit as one who worked forty hours a week.

It is not clear that *Hoffman* relied solely on the possibility that the union and the employer contemplated such a "bizarre result" in concluding that this particular benefit was a prerogative of seniority. Under the agreement in *Hoffman* an employee would receive SUB credits if he were on vacation, on jury duty, performing responsibilities as a union officer, or re-receive SUB credits if he were on va-related injury.[11] An employee on a voluntary leave of absence could neither accumulate nor use such credits.[12] Thus, the Court was confronted with a contract granting employees on leaves of absence for certain enumerated reasons the right to accumulate SUB credits, while denying such right to employees on leave for other reasons.[13] It could not be said, therefore, that the accumulation of SUB credits was conditioned exclusively on the actual performance of work.

It would seem that the Court in *Hoffman* concluded that the policies of § 459, as expressed in *Accardi*, required it, in the specific factual setting there, to resolve in favor of the returning veteran

the ambiguity in the contract as to whether the accumulation of SUB credits was a prerogative of seniority.

A close analysis of the SUB plan suggests a second possible distinction between *Hoffman* and the case *sub judice*. Unlike vacation benefits, the protection which the SUB plan furnishes is part of an employee's job security interest. The SUB plan is designed to and in fact does give the employee assurance that throughout his employment he not only earns his take home pay, but also accumulates assurance that, if exigencies of business require that he be laid off, he will have income for some period of time. The plan is a way of conferring, in diminished stature, one of the chief advantages of seniority, protection against economic loss in a period of diminishing employment. The SUB plan thus has as its purpose and effect the extension of a seniority-type protection to employees who, due to their relatively short length of service with the company, would formerly have been unprotected. Therefore, subsection 459(c), interpreted in the light of its overall purpose and applied to give effect to evolving practice in labor relations, can fairly be said to require that the returning veteran be accorded this seniority-type advantage.

### III.

Foster asserts that even if the reasoning in *Accardi* and *Hoffman* do not mandate reversal here, the Supreme Court in Eagar v. Magma Copper Company [14] has determined that vacation benefits are to be regarded as preroga-

---

10. Brief for Appellant at 13–15.

11. The agreement expressly precluded the accumulation of SUB credits by an employee while serving in the armed services "except as may otherwise be required by law." The Court apparently reasoned that this quoted language expressly contemplated that the contract would not affect the operation of § 459.

12. It would be illogical, of course, for a laid-off employee to accrue SUB credits. Such an employee uses these credits at a rate of one per week of layoff. If he could

at the same time accumulate credits, one purpose of the credit formula—to limit the company's liability for SUB's—would be, in part, defeated.

13. See Haggard at 542 for a discussion of the resolution of some apparent inconsistencies created by the language of the statute regarding leaves of absence and furloughs.

14. 389 U.S. 323, 88 S.Ct. 503, 19 L.Ed.2d 557 (1967) (per curiam), rehearing denied 389 U.S. 1060, 88 S.Ct. 767, 19 L.Ed.2d 866 (1968).

tives of seniority. In *Eagar* the collective bargaining agreement required an employee to work 75 per cent of his available shifts within the year and to be in the service of the company at the end of his "vacation earning year" in order to receive vacation benefits for that year.[15] Because the plaintiff had met the first prerequisite—he had worked 75 per cent of the available shifts—*Eagar* is not persuasive authority for the proposition that vacation benefits are under all circumstances prerogatives of seniority. *Eagar* does establish that should military service prevent an employee from working on a particular day—the last day of his "vacation earning year—" he does not forfeit benefits that he has already earned and would receive but for that specific absence.[16] To this limited extent, vacation benefits are considered dependent on length of service, or, in alternative terminology, the veteran is regarded as being "continuously [employed] from the time of his entering the armed forces until the time of his restoration to such employment." [17]

The Circuits, however, differ as to whether *Eagar* commands automatic classification of vacation benefits as seniority rights regardless of the fact that a particular collective bargaining agreement purports to condition the receipt of vacation benefits on the completion of a specified amount of work.

In Kasmeier v. Chicago, Rock Island and Pacific Railroad Company,[18] the Tenth Circuit declined to extend 1968 vacation benefits to an employee who worked 53 days during 1967 before entering the armed services, where the labor contract required "compensated service on not less than one hundred ten (110) days during the preceding calendar year." The court reasoned that *Eagar* did not control since the plaintiff there had met the work requirement.[19] This Court, in Dougherty v. General Motors Corporation,[20] a pre-*Eagar* case, refused to compel the payment of vacation benefits to a returning veteran in 1946, when the collective bargaining agreement required earnings in 1945, a year during which the veteran was a member of the armed services, to qualify for a vacation in 1946.[21]

The Ninth Circuit, on the other hand, in Locaynia v. American Air Lines,[22] seems to have held that vacation benefits are *ipso facto* prerogatives of seniority.[23] It appears, however, that the collective bargaining agreement in *Locaynia* did not provide that a specified minimum amount of work was pre-

15. Magma Copper Co. *v.* Eagar, 380 F.2d 318, 319–320 (9th Cir. 1967).

16. *See* Hollman v. Pratt & Whitney Aircraft, 435 F.2d 983, 988 (5th Cir. 1970).

17. 50 U.S.C. App. § 439(c)(2). In Morton v. Gulf, M. & O. R.R., 405 F.2d 415 (8th Cir. 1969), the contract provided that the number of days of vacation to which an employee was entitled depended on the number of years of compensated service he had with the company. The court concluded that under this contract the amount of vacation did depend on length of service. There is no dispute as to the amount of vacation benefits for which Foster is presently eligible. Instead, Foster seeks vacation benefits for years credited to him for the purpose of computing his present benefits but for which he received no benefits.

18. 437 F.2d 151 (10th Cir. 1971).

19. *Id.* at 154–155.

20. 176 F.2d 561 (3d Cir. 1949).

21. *See also* Dugger v. Missouri Pac. R.R., 403 F.2d 719 (5th Cir. 1968) (per curiam), cert. denied, 395 U.S. 907, 89 S.Ct. 1752, 23 L.Ed.2d 222 (1969), aff'g 276 F.Supp. 496 (S.D.Tex.1967) (failure to meet requirement that employee render compensated service on at least 110 days in preceding calendar year precludes the awarding of vacation benefits to employee who worked for only 85 days because of military service).

Dravo's counsel urged at oral argument that the reasoning and holding of *Dougherty* control here. We cannot, however, affirm the district court on the basis of *Dougherty* without giving careful attention to the impact, if any, of the intervening Supreme Court decisions in *Accardi* and *Eagar* on the precedential value of *Dougherty*.

22. 457 F.2d 1253 (9th Cir.), cert. denied, 409 U.S. 982, 93 S.Ct. 317, 34 L.Ed.2d 246 (1972).

23. *See* Comments, Reemployment Rights: The Veteran and the Vacation Benefit, 52 B.U.L.Rev. 480 (1973).

requisite to the employee's vacation benefits.[24] In Ewert v. Wrought Washer Manufacturing Company,[25] the Seventh Circuit cites *Locaynia* and uses broad language [26] in sustaining the veteran's claim to vacation benefits. Again, however, the contract in *Ewert* did not contain the type of work requirement present and not met in *Kasmeier* and *Dougherty*.[27] Although it is possible to distinguish these cases from *Kasmeier*, for example, on the basis of differences in the terms of the labor contracts, it is perhaps more candid to concede that a conflict in the Circuits does exist, since it appears that *Locaynia* and *Ewert* did not give more than cursory examination to the provisions of the collective bargining agreement.

## IV.

We are thus faced with a difficult choice: (1) to eschew careful analysis of the collective bargaining agreements, implicitly admitting perhaps that courts are inherently incapable of engaging in the somewhat amorphous inquiry necessary to arrive at a just and reasonable construction of the terms of such contracts;[28] (2) or, to venture into that unclearly marked terrain of labor contract interpretation to determine whether the vacation benefits provided by particular agreements are rewards for length of service or additional compensation for work performed. If the former course is followed, then vacation benefits, at least with respect to the returning veteran, would always be considered prerogatives of seniority.

■ We conclude, instead, that it is our responsibility to give close attention to the contract and other related factors in reaching a determination whether the employer and the employees, through their representatives, viewed the particular benefit as additional compensation for work performed or a prerogative of seniority. In situations where a court does not have the fortuitous alternative of referring a dispute to someone, such as an arbitrator, more experienced in dealing with the ambiguities and inconsistencies in labor contracts, we find no authority for the proposition that the court is to abdicate its responsibility to fashion a solution after searching inquiry and careful deliberation.[29] Al-

24. 457 F.2d at 1254 n. 2.

25. 477 F.2d 128 (7th Cir. 1973).

26. The Court in *Ewert* stated:
. . . Whatever one may conclude about the correctness of *Dugger* and *Kasmeier* with respect to the contracts there considered, we have no difficulty in concluding, under *Eagar's* application of *Accardi*, that the vacation rights under the contract in this case are perquisites of seniority. Accordingly it is unnecessary to decide that there are no conceivable contractual provisions under which vacation rights are so purely additional compensation for services actually rendered, and so independent of seniority that *Eagar* would not apply. *Id.* at 129.

27. Ewert v. Wrought Washer Mfg. Co., 335 F.Supp. 512, 512 n. 1 (E.D.Wis.1971).

28. In *Ewert*, the court, although itself disdaining significant examination of the collective bargaining agreement, expressly rejected the apparent statement of the lower court that "vacation rights are always perquisites of seniority, and that there could be no contractual provisions under which vacation

rights would fall into the class of other benefits." 477 F.2d at 128–129.

29. We are aware that the task of interpreting labor agreements is an intricate and somewhat specialized one. When the contract provides for arbitration, the Supreme Court has instructed courts to refer disputes concerning the meaning and scope of substantive provisions to the arbitrator unless there is an "express provision excluding a particular grievance from arbitration" or "forceful evidence of a purpose to exclude the claim from arbitration." United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 584–585, 80 S.Ct. 1347, 1354, 4 L.Ed.2d 1409 (1960). In reaching its decision in *Warrior & Gulf*, the Supreme Court noted that the collective bargaining agreement was, in a sense, *sui generis*:
. . . It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate . . . It calls into being a new common law—the common law of a particular industry or of a particular plant. *Id.* at 578–579, 80 S.Ct. at 1351.

though Congress by way of § 459, has thrust upon the courts controversies necessitating resort to labor contracts for their resolution, it has not directed them to abandon their normal procedures. In *Accardi,* the Supreme Court seems to have rejected any suggestion that it was to adopt a novel approach in § 459 cases.[30] In an earlier case, Aeronautical Lodge 727 v. Campbell,[31] the Court's language suggests the conclusion we reach here:

> It is . . . . apparent that Congress was not creating a system of seniority but recognizing its operation as part of the process of collective bargaining. We must therefore look to the conventional uses of seniority . . . which the Selective Service Act guaranteed the veteran. Barring legislation not here involved, seniority rights derive their scope and significance from union contracts. . . .[32]

### V.

Although the language of the contract requiring the employee simply to receive earnings in at least twenty-five weeks is arguably ambiguous, it is not realistic to surmise that any employee could work for substantially less than the number of hours customarily regarded as constituting a full work week for any period of time without being discharged. Even assuming, for example, that a particular employee's job calls for ten hours of work per week, it is questionable that an arbitrator, or a court in the absence of an arbitration provision, would award such employee full vacation benefits under this contract. It appears quite likely that if this problem were raised during negotiations, the parties' understanding would comport with such a determination.

A more detailed examination of Foster's claim to vacation benefits and of the terms of the collective bargaining agreement, informed by an appreciation of the background understandings shared by the parties to labor contracts, supports the conclusion that the vacation benefits are not prerogatives of seniority.

It has been stipulated that from August 5, 1965 until his 1967 induction into the armed forces, Foster was employed by Dravo "as a scaler at an hourly rate of $2.62." Upon his release from military service he was "restored in his pre-service position . . . on or about October 7, 1968, at an hourly rate of $2.92." It also is stipulated that before and after military service Foster was recognized as enjoying "plant seniority" as of August 4, 1965, the date of his original hiring.

"Seniority," as used in this stipulation and generally in labor relations, is a priority factor that normally serves to protect workers' long term interest in job security by determining preference in such matters as advancement, layoffs and rehiring. Indeed, Article XIV of the labor contract that regulated Foster's employment defined "Seniority" as "the right of preference in layoffs or rehiring, measured by length of service in a job classification. . . ." Foster's interests of the type that are normally determined by seniority have been duly protected by measuring his seniority

---

The court added that the arbitrator might well introduce relevant considerations customarily ignored by courts when construing the provisions of a typical commercial contract. *Id.* at 581–582, 80 S.Ct. 1347. See Cox, Reflections Upon Labor Arbitration, 72 Harv.L.Rev. 1487, 1500 (1959). However, in some situations, including the § 9 case before us, courts cannot escape from interpreting collective agreements. *See* Boys Markets, Inc. v. Retail Clerks Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). *See generally* Note, Labor Injunc-

tions, *Boys Markets,* and the Presumption of Arbitrability, 85 Harv.L.Rev. 636, 644–49. *Warrior & Gulf,* although raising questions as to judicial competence in this area, does not suggest that courts should woodenly construe labor contracts when the alternative of arbitral decision is unavailable.

30. *See* pp. 58–59, *supra;* Haggard at 571.

31. 337 U.S. 521, 69 S.Ct. 1287, 93 L.Ed. 1513 (1949).

32. *Id.* at 526, 69 S.Ct. at 1290.

from the date of his original employment without interruption by reason of his military leave.

Vacation with pay, on the other hand, is normally and reasonably considered part of a worker's current or short term return for labor. Under this view, actual work time during a year provides a fair measure of the amount of annual vacation currently earned.[33] Accordingly, the labor contract in this case measures the amount of paid vacation that a worker has earned on a basis different from seniority.

The contract specifies that to qualify for the maximum allowable annual vacation a worker must have "received earnings" in 25 work weeks during the immediately preceding calendar year. Thus, it is reasonable to treat the vacation pay that the employer provides as deferred compensation for work recently performed. But during about nine months of each of the years in question here [34] Foster was a soldier and the army was responsible for his pay, on leave as well as during duty. To allow him at the same time to accrue civilian vacation credit in anticipation of his return to civilian employment would be inconsistent with, or at least an anomalous exception to, the general concept of earned vacation. Accordingly, section 459(c) is fairly and reasonably construed as not obligating the civilian employer to confer that benefit upon the returning soldier unless it is the employer's practice to accrue vacation pay credits for employees during similar periods of uncompensated leave granted for reasons other than military service. It is nei-

ther alleged nor indicated by the record that the present employer has engaged in any such practice.

This case does not present a dilemma like the one this Court faced in *Hoffman* —some employees on leaves of absence received SUB credits under the agreement while others did not. Hence, we need not rely on the general Congressional policies undergirding § 459 in order to resolve an ambiguity created by inconsistent treatment of situations similar to the veteran's in the collective bargaining agreement. Further, as we have already indicated, the essential character of the respective benefits at issue in *Hoffman* and this case are significantly different.

Moreover, there are not present here circumstances where the veteran has barely failed to qualify for full benefits under the language of the contract.[35] Close adherence to the contractual language will not therefore be manifestly unjust and there is little danger that such adherance will promote disharmony between the employer and the employee.

In sum, we hold that the terms of this collective bargaining agreement require twenty-five full work weeks,[36] and Foster's failure substantially to comply in this case precludes his claim to full vacation benefits. This result is consistent with the general purpose of § 459 to assure that the veteran when he returns to his pre-induction employment relationship is not disadvantaged vis-a-vis fellow employees who did not enter the military service. To hold that in this case Foster is entitled to vacation benefits, we would, in effect, be granting to

33. Seniority also may be consequence to the extent that a worker is allowed a shorter maximum vacation for his first or other early year of employment than for a subsequent year. It is not disputed here that the appellant is entitled to full seniority from the date of his original employment in determining how long a vacation he could earn during a particular calendar year.

34. The claim here covers vacation pay for the full calendar years during which the appellant entered and left military service.

35. *Cf.* Dugger v. Missouri Pac. R.R., 403 F. 2d 719 (5th Cir. 1968) (per curiam), cert. denied, 395 U.S. 907, 89 S.Ct. 1752, 23 L. Ed.2d 222 (1969), aff'g 276 F.Supp. 496 (S. D.Tex.1967).

36. *See* Fees v. Bethlehem Steel Corp., 335 F.Supp. 487 (D.C.W.D.Pa.1971); Bradley v. General Motors Corp., 283 F.Supp. 481 (E. D.Mo.1968).

the returning veteran a windfall at the expense of his employer and be discriminating against employees who are required to meet the conditions of the collective bargaining agreement if they are to receive vacation benefits. This outcome would be contrary to the intent and logic of § 459.

### VI.

 Our determination that Foster is not entitled to full vacation benefits under the collective bargaining agreement does not prevent his asserting a claim for pro rata vacation benefits under the provision of the contract providing for such benefits.[37] The district court did not decide whether Foster is entitled to such benefits.

Although the complaint contains a general claim for vacation benefits, there is no specific averment relating to the pro rata benefits. The distinguished district court judge, however, after Foster's counsel adverted to the provision relating to pro rata benefits, urged the parties to reach a compromise apparently along lines suggested by the language of that provision.[38] In light of these conflicting circumstances, revealed in the record, we believe an appropriate course is to remand for a determination whether the question of Foster's right to pro rata benefits was properly raised in the district court and, if so, for a decision on the merits of his claim to pro rata benefits.

Accordingly, the judgment will be vacated and the case remanded for action in conformity with this opinion.

HASTIE, Circuit Judge (concurring).

I agree and add only that, in my view, the considerations that are decisive in this case and should be most helpful to district judges in distinguishing advantages of seniority from "other benefits" under Section 459(c), are those set out in Part V of Judge Adams' opinion.

---

37. Article XIV, section 2 of the collective bargaining agreement provides, in part, as follows:

> However, employees who are laid off during the year immediately preceding December 31 and because of such layoff do not qualify for a vacation under this section will be given a pro rata vacation to which they might otherwise be entitled on the relationship of the weeks they did work to twenty-five (25) weeks but in no case more vacation than they would have received under this Section if they had worked (25) weeks or more.

