John MUSCAR, Sr., Robert R. Wallace, and Raymond J. Kretzler, Plaintiffs,

v.

ARCO CHEMICAL COMPANY, a DIVISION OF ATLANTIC-RICHFIELD COMPANY, Defendant.

Civ. A. No. 85–2970.

United States District Court, W.D. Pennsylvania.

Dec. 22, 1986.

Vincent J. Restauri, Pittsburgh, Pa., for plaintiffs.

Jess Womack, Atlantic Richfield Co., Philadelphia, Pa., Charles W. Kenrick, Pittsburgh, Pa., for defendant.

## OPINION

GERALD J. WEBER, District Judge.

The remaining issues in this case come before the court on cross motions for summary judgment. The parties have submitted briefs and supporting evidentiary materials, and after careful review of these we conclude that there are no disputed issues of material fact and defendant is entitled to summary judgment.

### I. Facts

The three plaintiffs were hourly employees at the ARCO Polymers Plant in Monaca, Beaver County, Pennsylvania. John Muscar began his employment there in 1947, Robert Wallace in 1951, and Raymond Kretzler in 1972.

On April 5, 1982, Robert Wallace submitted an application for retirement benefits requesting an effective date of August 1, 1982. Raymond Kretzler and John Muscar filed similar applications on July 13 and July 20, 1982, respectively, both requesting an effective date of September 1, 1982. Plaintiffs were under no compulsion to retire but rather chose to do so voluntarily.

All these plaintiffs ceased reporting for work on their effective dates of retirement. Also on or about their effective dates, plaintiffs received their first pension benefits check, and continued to receive benefits checks thereafter. These checks were termed an "advance" by the Company and plaintiffs were informed that the checks were based on an estimate of the pension benefit which was subject to adjustment upon plaintiffs' selection of a payment mode and on final calculation of the amount of benefits. Plaintiffs accepted and cashed these checks as they received them.

Plaintiffs' retirement applications were sent to and processed by ARCO's Retirement Office, located in Los Angeles, California. ARCO records reveal that the retirement applications of Muscar and Wallace were formally accepted on December 1, 1982, and Kretzler's was accepted on January 1, 1983. At that time, the final benefits calculation and any necessary adjustments were made.

On September 14, 1982, after plaintiffs had filed their retirement applications, ceased to work, and received their first pension checks, ARCO announced a Special Early Retirement Program for hourly employees of ARCO Chemical. Hourly employees of the ARCO Polymers Beaver County Plant who were on the payroll on September 14, 1982 were eligible to select, this Special Plan which was more lucrative financially than the regular pension plan.[1] The purpose of the Special Plan was simply to effect a reduction in the work force.

Following announcement of the Special Plan, plaintiffs sought to be included in it. The president of the union Local wrote to the Company requesting that plaintiffs be included in the Special Plan. The Company refused, contending that plaintiffs had retired prior to the date of the Special Plan and were therefore ineligible.

## II. Offer and Acceptance

Plaintiffs ground their principle argument in basic contract law. It is plaintiffs' contention that their retirement applications were *offers* to retire, submitted to the Company for acceptance. However, before the Company accepted those offers, plaintiffs in effect withdrew them and accepted the Company's offer of a Special Early Retirement Plan.

The flaw in plaintiffs' argument lies in its basic premise: the characterization of the retirement applications as mere offers subject to acceptance, rejection or withdrawal.

The regular pension plan, or General Plan, which plaintiffs bargained for and retired under, is governed by ERISA, 29 U.S.C. § 1001 et seq. That Act provides employees with non-forfeitable interests in the plan, interests which the employer is without discretion to deny. § 1002(19); § 1053. When an employee meets the requirements of the Plan and applies for benefits, benefits *must* be paid. § 1132. In this context it is important to note that the employee's application for pension benefits is characterized by the Act as an "election" or "claim" for his interests or "rights" in the Plan. E.g., § 1053; § 1056; § 1133.

In this light, plaintiffs' applications are not offers. They lack a fundamental characteristic of offers: they cannot be refused. The retirement application is instead merely the employee's choice of the benefit he bargained and worked for and is the switch which sets the administrative machinery in motion to determine the employee's rights in the Plan. Rather than an "offer to retire," it is a decision to invoke rights earned in the course of years of employment.

Since the application is not an "offer" to be accepted, the date of retirement is determined not by the formal acceptance of the application, which is a record-keeping matter, but rather by the date an employee

---

**1.** Briefly, the Special Plan permitted an employee to retire early at full pension even though his rights to full pension had not yet vested. Furthermore, the Plan provided for a salary contin- uation—that is, payment of the difference between an employee's pension benefit and his salary for the period of one year.

ceases working. As we have seen, each of the three plaintiffs had selected an effective retirement date prior to the Special Plan, had ceased working on that date, and had accepted and cashed the first payment of pension benefits. Putting aside all the semantics of plaintiffs' argument and the formalisms of the Company's administrative process, the answer to the central issue in this case is eminently simple: plaintiffs retired when they stopped working.

## III. Tacking

■ Plaintiffs also argue that Company policy required the tacking on of accrued vacation time and sick days to an employee's last date of work to determine that employee's actual date of termination or retirement. Applying this policy to plaintiffs, each would have been on the payroll during the period when the Special Plan was offered and therefore would have been eligible to select it.

In support of their contention that tacking is a Company policy, plaintiffs submit evidence concerning the January 9, 1981 discharge of Harriet King. In a letter from the Company Ms. King was informed that because of vacation days and severance her effective date of termination would be January 31, 1981, several weeks after her actual discharge.

From this one incident plaintiffs try to extrapolate a company-wide policy. Ignoring for the moment the fact that the incident occurred over a year and a half earlier and involved a discharge rather than a pension, we simply cannot divine a company policy from one isolated occurrence. Plaintiffs' evidence fails to establish a company policy for tacking.

Plaintiffs also cite two cases which they contend establish that vacation and sick days are to be considered as "work time." *Elswick v. The New River Co.*, BRB No. 80–179 BLA, at p. 1–1113; *Foster v. Dravo Corp.*, 490 F.2d 55 (3d Cir.1973). Neither case involves pensions or tacking. The first is a black lung benefits case and the latter involves the claim for vacation pay under a collective bargaining agreement and the Selective Service Act of 1967 of an employee drafted into the military. These cases provide neither solace nor support for plaintiffs.

## IV. Conclusion

These plaintiffs all retired within weeks prior to the unveiling of a more lucrative Special Early Retirement Plan. Each plaintiff had ceased working, had accepted and cashed his first pension check and for all intents and purposes, both from their viewpoint and the Company's, had entered upon their retirement. Their retirement applications were not offers to contract for benefits, but rather the administrative form which embodied their election of rights under the existing pension plan.

Though it seems harsh and unfeeling to deny a loyal employee the opportunity to enrich his retirement plan solely because he missed the boat by two weeks, the company also has a considerable interest in establishing with some certainty a cutoff date for eligibility. To extend the program retroactively would also be fundamentally inconsistent with the purpose of the Special Plan, which was to effect a cost savings by inducing a reduction in force. Offering special retirement benefits to men who have already retired does not advance the Company's purpose.

Because plaintiffs' retirement applications were not "offers" in the contract law sense of the term, and because plaintiffs cannot produce evidence or authority to establish a Company policy of "tacking," summary judgment will be entered in favor of defendant and against plaintiffs.