**Francis X. DUFNER, Plaintiff,**

v.

**PENN CENTRAL TRANSPORTATION COMPANY, Defendant.**

. Civ. A. No. 72-1324.

United States District Court,
E. D. Pennsylvania.

March 15, 1974.

980

Sidney Salkin, Philadelphia, Pa., for plaintiff.

Hermon M. Wells, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

FOGEL, District Judge.

This is an action brought by Francis X. Dufner, an employee of the Penn Central Transportation Company (Penn Central), pursuant to provisions of the Military Selective Service Act of 1967, as amended, 50 U.S.C. App. § 459 (hereinafter referred to as the Act).[1]   Juris-

---

1. Plaintiff has been granted leave to proceed in the present action by the Reorganization Court, E.D.Pa., No. 70-347, Fullam, J.

diction is conferred upon this Court by 50 U.S.C. App. § 459(d).[2]

The case presents the following issue for resolution, apparently one of first impression in the courts: Whether a returning veteran must be immediately restored to coverage under his employer's group medical insurance policy, or whether he may be compelled to undergo a waiting period before coverage resumes, pursuant to a requirement of "compensated service" in the month prior to resumption of coverage, which waiting period is in fact imposed without discrimination between veteran and non-veteran returnees to employment. Resolution of this matter turns upon the characterization of the insurance coverage sought by the employee, and interpretation of the "seniority" and "insurance or other benefits" clauses of §§ 459(b) and 459(c), in the context of the factual situation presented by the litigation.

All material facts have been stipulated by the parties,[3] who agree that a final

---

2. 50 U.S.C. App. § 459(d) provides as follows:

(d) Jurisdiction of district court; United States attorney to act for claimant

In case any private employer fails or refuses to comply with the provisions of subsection (b), subsection (c)(1), subsection (c)(3) or subsection (g) [of this section], the district court of the United States for the district in which such private employer maintains a place of business shall have power, upon the filing of a motion, petition, or other appropriate pleading by the person entitled to the benefits of such provisions, specifically to require such employer to comply with such provisions and to compensate such person for any loss of wages or benefits suffered by reason of such employer's unlawful action: *Provided*, That any such compensation shall be in addition to and shall not be deemed to diminish any of the benefits of such provisions. The court shall order speedy hearing in any such case and shall advance it on the calendar. Upon application to the United States attorney or comparable official for the district in which such private employer maintains a place of business, by any person claiming to be entitled to the benefits of such provisions, such United States attorney or official, if reasonably satisfied that the person so applying is entitled to such benefits, shall appear and act as attorney for such person in the amicable adjustment of the claim or in the filing of any motion, petition, or other appropriate pleading and the prosecution thereof specifically to require such employer to comply with such provisions: *Provided*, That no fees or court costs shall be taxed against any person who may apply for such benefits: *Provided further*, That only the employer shall be deemed a necessary party respondent to any such action.

3. STIPULATION

The facts in this action are stipulated as follows:

1. This action arises under the Military Selective Service Act of 1967, as amended, (formerly the Universal Military Training and Service Act) 50 U.S.C.A. Appendix 459, hereinafter referred to as the Act. The Court has jurisdiction under paragraph (d) of said section.

2. Plaintiff is Francis X. Dufner, who resides at 3236 Knorr Street, Philadelphia, Pennsylvania, within the jurisdiction of the Court.

3. Defendant is the Penn Central Transportation Company, hereinafter Penn Central. Penn Central maintains a place of business at Six Penn Center Plaza, Philadelphia, Pennsylvania, 19104, within the jurisdiction of this Court. Since June 21, 1970, Penn Central has been in reorganization under the Federal Bankruptcy Act.

4. Plaintiff was first employed by The Pennsylvania Railroad Company, predecessor of Penn Central, on December 30, 1964, in class or craft of clerk. He continued in such employment until July 15, 1965. His position was other than temporary.

5. On July 15, 1965, Plaintiff left his position for the purpose of induction into the Armed Forces of the United States, and was so inducted on or about July 30, 1965. On or about February 20, 1969, Plaintiff received an honorable discharge from the Armed Forces and received a certificate showing satisfactory completion of his military training and service.

6. Plaintiff complied with all the statutory requirements for restoration to his employment by Penn Central, including timely application therefor on March 14, 1969, and was restored to active service in his pre-service occupation on or about March 17, 1969.

7. At all times relevant hereto within Plaintiff's employment by the defendant,

adjudication can be rendered on the basis of the stipulation and cross-motions for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.

The following facts are relevant to an ultimate determination of the case:

Plaintiff Dufner was first employed by the Pennsylvania Railroad Company, predecessor of defendant Penn Central, on December 30, 1964, in the position of clerk, a position which was other than temporary. On July 15, 1965, Dufner left this position in anticipation of his induction into the Armed Forces of the United States on or about July 30, 1965. Thereafter he was honorably discharged on or about February 20, 1969, and received a certificate of satisfactory completion of training and service, pursuant to the provisions of 50 U.S.C. App. §

459(a). He made timely application for restoration to his pre-service employment on March 14, 1969, and accordingly was restored to active employment at Penn Central on March 17, 1969. At some time following his restoration to employment at Penn Central, but prior to April 1, 1969, Dufner was involved in accidents which resulted in medical treatment and hospitalization, for which he incurred expenses of $828.35. He applied for benefits under a group insurance policy known as "Group Policy Contract No. GA–23,000", which covered the class of employees to which Dufner belonged, but payment was denied on the ground that Dufner, who had not rendered "compensated service" until the month of March, 1969, did not qualify under the provisions of the policy until the month *following* his return to active

both before and after his military service, he was one of a covered class of employees under a certain group health and accident insurance policy designated as "Group Policy Contract No. GA–23,000", as amended. Said contract provided certain health and welfare benefits, including hospital insurance, and constituted one of the collectively bargained agreements between Penn Central and various labor organizations representing its employees. The organization which represented clerical employees such as Plaintiff, namely, the Brotherhood of Railway, Airline and Steamship Clerks, was a party to said Group Policy Contract.

8. Article IV requires the defendant to pay specified amounts for each employee named by Plaintiff herein,

". . . who rendered compensated service or received vacation pay from a signatory Employer in the preceeding calendar month . . ."

Article VI(1)(a)(iv) Eligibility for Benefits states:

"an Employee who returns to compensated service with or receives vacation pay from the Employer while insured under (i), (ii), or (iii) above shall continue to be insured for Employee Benefits as provided in Article VII hereof during the month in which he returns to such service or receives such pay."

9. If Plaintiff had not been required to leave his position for purposes of military service in the Armed Forces of the United States, he would have been continuously employed by the Defendant and Defendant would have continued to pay premiums pro-

viding Plaintiff with the aforementioned insurance coverage without interruption during the period of Plaintiff's absence in military service.

10. Following Plaintiff's return from military service on March 17, 1969 and prior to April 1, 1969, Plaintiff was involved in accidents resulting in injuries which required hospital and medical treatment and for which Plaintiff incurred expenses amounting to $828.35. Said injuries were of a type covered by the benefit provisions of Group Policy Contract No. GA–23,000.

11. Plaintiff applied for benefits under Group Policy Contract No. GA–23,000, but said benefits were denied on account of Defendant's position that Plaintiff, at the time his injuries occurred, was not insured for benefits under said policy and did not become so insured prior to April 1, 1969 under the terms of the policy, because Plaintiff had not rendered "compensated service" in the month prior to his return from military service.

12. A copy of Group Policy Contract No. GA–23,000 as in force at the time material to this action is included in this Stipulation and incorporated herein as Exhibit 1.

13. Following his return to service, Plaintiff's rates of pay and working conditions, including his seniority rights, were defined in an agreement between Penn Central and the Brotherhood of Railway, Airline and Steamship Clerks, a copy of which is included in this Stipulation and incorporated herein as Exhibit 2.

It is so stipulated.

service with Penn Central, and hence did not become insured until April 1, 1969. As a result of this denial of benefits, the instant action was instituted in Dufner's behalf by the United States Attorney for the Eastern District of Pennsylvania under the provisions of 50 U.S.C. App. § 459(d).

During the entire period of plaintiff's employment with Penn Central, both before and after his service in the armed forces, he was one of a class of employees covered by Group Policy Contract No. GA–23,000 (hereinafter referred to as the Contract), which constituted one of the agreements entered into as part of the collective bargaining process between Penn Central and the Brotherhood of Railway, Airline and Steamship Clerks, the union representing clerical employees, of which Dufner was one. Pertinent portions of the contract are set forth in the footnote.[4]

4.                ARTICLE II
          QUALIFYING EMPLOYEES

1. The Employees to whom this policy contract applies shall be those Employees of the signatory Employers who are identified in Exhibits A, B, C, D and E and who are or become "Qualifying Employees" as defined below.

2. An Employee who would have been a "Qualifying Employee" on March 1, 1968 under a Former Policy Contract if that Former Policy Contract had remained in full force and effect on such date, or who would have been a "Qualifying Employee" on March 1, 1968 under this policy contract had this policy contract remained in full force and effect on such date without amendment, shall be a "Qualifying Employee" as of March 1, 1968.

3. Except as provided in Paragraph 5 below, an Employee who would have first become a "Qualifying Employee" on a date subsequent to March 1, 1968 under a Former Policy Contract if that Former Policy Contract had remained in full force and effect on such date, or who would have first become a "Qualifying Employee" on a date subsequent to March 1, 1968 under this policy contract had this policy contract remained in full force and effect on such date without amendment shall be a "Qualifying Employee" as of such date.

4. In any case of enlargement of the Employees to whom this policy contract applies, in accordance with Article III hereof,

(a) an Employee who shall have established and maintained an employment relationship for Thirty continuous calendar days with the same signatory Employer in a capacity covered by Exhibit A, B, C, D or E prior to the effective date of such enlargement and who shall have rendered compensated service within Ninety days of that date shall be a "Qualifying Employee" as of such effective date; and

(b) an Employee who shall have established and maintained an employment relationship for Thirty continuous calendar days with the same signatory Employer in a capacity covered by Exhibit A, B, C, D or E prior to the effective date of such enlargement but who shall not have rendered compensated service within Ninety days of that date shall be a "Qualifying Employee" as of the first day of the first calendar month following such enlargement after he shall again have rendered compensated service to such Employer in such capacity or received vacation pay.

5. An Employee who, on or after February 1, 1968, shall complete Thirty continuous calendar days during which he has maintained an employment relationship with the same signatory Employer in a capacity covered by Exhibit A, B, C, D or E shall be a "Qualifying Employee" as of the first day of the first calendar month included in this policy contract which follows his completion of such Thirty days of continuous employment relationship.

6. An Employee who, having previously been a "Qualifying Employee", has ceased to be a "Qualifying Employee" by reason of the operation of Paragraph 7 of this Article II shall become again a "Qualifying Employee" in the month of his return to compensated service for or receipt of vacation pay from the same signatory Employer within the coverage of Exhibit A, B, C, D or E.

7. An Employee shall cease to be a "Qualifying Employee"

(a) on the last day of a calendar month in which such Employee has ceased to be employed by the same signatory Employer within the coverage of Exhibit A, B, C, D or E but if such Employee had rendered compensated service or received vacation pay in that month he will nevertheless be regarded as a "Qualifying Employee" in the next month for the purposes of Articles IV and V hereof;

(b) on the date on which the employment relationship of such Employee is terminated.

8. Notwithstanding the provisions of Paragraph 7(a), an Employee who shall have ceased to be employed within the coverage of Exhibit A, B, C, D or E but who continues to be employed by the same signa-

tory Employer and, without a break in his service, takes a position subject to an agreement held by a labor organization in which he will be covered by Another Railroad Health and Welfare Plan, will continue to be a "Qualifying Employee" hereunder while in continuous active service on such position until he qualifies for coverage under such other Railroad Health and Welfare Plan, and while he is in continuous active service on such position, compensated service on such position or receipt of vacation pay will be regarded as compensated service rendered or vacation pay received for the purpose of Article V hereof.

## ARTICLE IV

### PREMIUM

Insurance hereunder is granted in consideration of payments to the Insurer, in the manner and under the conditions hereinafter provided:

1. From and after March 1, 1968, payment of the aggregate of

(a) the sum of $33.64 (which sum includes $1.24 for benefits payable as a result of on-duty injuries) each month as to each Employee identified in Exhibits A, B and C who is a Qualifying Employee and who rendered compensated service to or received vacation pay from a signatory Employer in the preceding calendar month, of which $30.24 will be transmitted by his Employer, and $3.40 will be charged by the Insurer to the Special Account, as provided in Paragraph 1. (b) of Article V; and

(b) the sum of $22.98 each month as to each Employee identified in Exhibits D and E who is a Qualifying Employee and who rendered compensated service to or received vacation pay from a signatory Employer in the preceding calendar month of which $19.58 will be transmitted by his Employer, and $3.40 will be charged by the Insurer to the Special Account, as provided in Paragraph 1. (b) of Article V; except that the aggregate premium payable to the Insurer in any month in accordance with this Article and the amount to be transmitted to the Insurer in such month by any signatory Employer in accordance with Article V as to a Qualifying Employee shall be reduced by the monthly amount, if any, paid under the hospital services insurance plan of a Province or Territory of Canada to the appropriate agency of the Province or Territory as to such Qualifying Employee for the preceding month.

\* \* \* \* \*

## ARTICLE V

### PAYMENTS TO INSURER

1. (a) By the end of the month of March, 1968, and by the end of each calendar month thereafter, each signatory Employer named in Exhibit A, B, C, D or E shall, with the exceptions noted in 2 below, transmit to the Insurer the appropriate amount stipulated in Article IV hereof as to each of its Qualifying Employees who shall have rendered compensated service to or received vacation pay from the Employer in the preceding calendar month.

\* \* \* \* \*

## ARTICLE VI

### ELIGIBILITY FOR BENEFITS DESCRIBED IN ARTICLE VII

Part A—Applicable to Employees Identified in Exhibits A, B and C

1. a. An Employee who is identified in Exhibit A, B or C shall be insured for Employee Benefits as provided in Article VII hereof during and only during a month in which the signatory Employer by which he is employed is required to make the appropriate payment to the Insurer as to him as described in Paragraph 1(a) of Article V hereof, except that:

(i) insurance shall be continued in subsequent months for an Employee whose Employer is obligated to provide him continued benefits of the kind provided by this policy contract under compensation maintenance provisions of an agreement or an order of a regulatory authority, upon the payment by the signatory Employer of the appropriate amount under Article V in the same manner as if the Employee had rendered compensated service; and

(ii) the "appropriate payment" referred to above shall be waived and insurance shall be continued in subsequent consecutive months when no such payment is required under Paragraph 1(a) of said Article V solely as a result of the Employee's disability which prevents him from performing work in his regular occupation; and

(iii) an Employee who is placed on furlough on or after March 1, 1968 and who is identified in Exhibit A, B or C shall continue to be insured for Employee Benefits as provided in Article VII hereof during furlough until the end of the fourth month following the month in which the Employee last rendered compensated service to or received vacation pay from the Employer, provided the signatory Employer from whose service the Employee has been furloughed has transmitted an aggregate of not less than Three monthly pay-

Relevant to the case before us are certain critical provisions of Articles II, IV, V and VI of the Contract.

FIRST: Article IV requires Penn Central to make premium payments each month with respect to each "Qualifying Employee . . . who rendered compensated service to or received vacation pay from a signatory Employer in the preceding month."

SECOND: Article V requires transmission to the insurer of "the appropriate amount stipulated in Article IV hereof as to each of its Qualifying Employees who shall have rendered compensated service to or received vacation pay from the Employer in the preceding calendar month."

THIRD: Article II of the Contract defines the term "Qualifying Employee", and imposes a thirty day waiting period for new employees.

FOURTH: Article VI defines eligibility for benefits in language which states that an employee is insured "during and only during a month in which the Signatory Employer by which he is employed is required to make the appropriate payment to the insurer" described in Article V. There are three exceptions to this general provision, one of which is relevant to the present case. Article VI(A)(1)(a)(iii) provides that "an Employee who is placed on furlough [after the effective date of the current group policy] . . . shall continue to be insured for Employee Benefits . . . during furlough until the end of the fourth month following the month in which the Employee last rendered compensated service to or received vacation pay from the Employer".[5] Article VI (A)(1)(a)(iv) further provides that "an Employee who returns to compensated service with or receives vacation pay from the Employer while insured under (i), (ii) or (iii) above shall continue to be insured for Employee Benefits . . . during the month in which he returns to such service or receives such pay."

FIFTH: Article VI(A)(2)(a) provides that, subject to a number of exceptions, "an Employee shall be eligible for Employee Benefits . . . with respect to bodily injuries occurring while he is insured hereunder . . . ." Subsection (c) of the same section provides that no benefits will be payable "after an Employee has failed to render compensated service or receive vacation

---

ments as to such Employee under this policy contract and any Former Policy Contract; and

(iv) an Employee who returns to compensated service with or receives vacation pay from the Employer while insured under (i), (ii) or (iii) above shall continue to be insured for Employee Benefits as provided in Article VII hereof during the month in which he returns to such service or receives such pay.

\* \* \* \* \*

2. a. Subject to the provisions of Paragraph 4 below, an Employee shall be eligible for Employee Benefits as provided in Article VII hereof with respect to bodily injuries occurring or sicknesses commencing while he is insured hereunder or under a Former Policy Contract and with respect to bodily injuries or sicknesses in connection with which he would have been eligible for Employee Benefits hereunder or under a Former Policy Contract if this policy contract had not been amended and such Former Policy Contract had remained in full force and effect. A sickness shall be deemed to commence when the initial expense for treatment thereof is incurred or when the Employee because of such sickness becomes disabled and prevented from performing work in his regular occupation, whichever first occurs.

\* \* \* \* \*

4. In no event will Employee Benefits be payable—

\* \* \* \* \*

c. after an Employee has failed to render compensated service or receive vacation pay for a period of One Calendar Year (Two Calendar Years with respect to benefits under Article VII, Parts E and F) until such time as the Employee again renders compensated service or receives vacation pay and becomes insured in accordance with Paragraph 1 above.

5. The effective date of the group policy submitted to the Court is March 1, 1968. However, it has been expressly stipulated that this policy was in effect "[a]t all times relevant hereto within Plaintiff's employment by the defendant, both before and after his military service." Stipulation, No. 7.

pay for a period of One Calendar Year (Two Calendar Years with respect to benefits under Article VII, Parts E and F) until such time as the Employee again renders compensated service or receives vacation pay and becomes insured in accordance with Paragraph 1 above . . . ."

Thus, the over-all parameters of insurance coverage under the Contract clearly emerge from the delineated provisions.

In essence, the following scheme is created:

(1) A new employee must complete thirty continuous calendar days of employment in a capacity covered under the Contract.

(2) On the first day of the calendar month thereafter he becomes a "Qualifying Employee".

(3) If he thereafter ceases to be a "Qualifying Employee" because he leaves his employment, he again becomes a "Qualifying Employee" in the month of his return to compensated service or receipt of vacation pay.

In sum, there is only one waiting period before becoming a "Qualifying Employee", even though there may be an interruption in the employment relationship. It is conceded that Dufner was a "Qualifying Employee" in the month of his return to active employment on March 17, 1969.

However, a second requirement exists for coverage under the terms of the Contract. Article VI provides coverage for an employee only *during* a month in which a premium is paid by the employer with respect to that employee, while Article IV mandates payment of the premium in the *ensuing calendar month after* the employee performs compensated service or receives vacation pay. In the case of a furloughed employee, coverage ceases after four months, and the requirement for a premium payment arises only in the month *following* the month in which the employee returns to compensated service or receives vacation pay. Thus, a returning employee is sub-

ject to a second waiting period before coverage resumes under the Contract, unless he is within the sweep of one of the exceptions of Article VI(A)(1)(a) (i)–(iii).

Although Dufner became a "Qualifying Employee" immediately upon his return to active employment on March 17, 1969, no premium became payable by Penn Central before the month commencing April 1, 1969, and therefore he did not have insurance coverage until the latter date. This lawsuit has its genesis in the circumstances which gave rise to plaintiff's injury between March 17, 1969, and March 31, 1969, an interim period during which premiums were not payable and insurance coverage was therefore not available to plaintiff under the controlling terms of the Contract.

It is clear from the above analysis that the provisions of Group Policy Contract No. GA–23,000 proscribe an award of any benefits to Dufner for the accident which occurred before April 1, 1969. The government maintains, however, on Dufner's behalf, that benefits must be conferred pursuant to statutory rights created by the Military Selective Service Act of 1967, the relevant portions of which provide as follows:

(b) Reemployment rights

In the case of any such person who, in order to perform such training and service, has left or leaves a position (other than a temporary position) in the employ of any employer and who (1) receives such certificate, and (2) makes application for reemployment within ninety days after he is relieved from such training and service or from hospitalization continuing after discharge for a period of not more than one year—

\*      \*      \*      \*      \*      \*

(B) if such position was in the employ of a private employer, such person shall—

(i) if still qualified to perform the duties of such position, be restored by such employer or his successor in interest to such position or to a po-

sition of like seniority, status, and pay; or

(ii) if not qualified to perform the duties of such position by reason of disability sustained during such service but qualified to perform the duties of any other position in the employ of such employer or his successor in interest, be restored by such employer or his successor in interest to such other position the duties of which he is qualified to perform as will provide him like seniority, status, and pay, or the nearest approximation thereof consistent with the circumstances in his case,

unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so;

\* \* \* \* \* \*

(c) Service considered as furlough or leave of absence

(1) Any person who is restored to a position in accordance with the provisions of paragraph (A) or (B) of subsection (b) [of this section] shall be considered as having been on furlough or leave of absence during his period of training and service in the armed forces, shall be so restored without loss of seniority, shall be entitled to participate in insurance or other benefits offered by the employer pursuant to established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time such person was inducted into such forces, and shall not be discharged from such position without cause within one year after such restoration.

(2) It is declared to be the sense of the Congress that any person who is restored to a position in accordance with the provisions of paragraph (A) or (B) of subsection (b) [of this section] should be so restored in such manner as to give him such status in his employment as he would have enjoyed if he had continued in such employment continuously from the time of his entering the armed forces until the time of his restoration to such employment.

(3) Any person who holds a position described in paragraph (A) or (B) of subsection (b) [of this section] shall not be denied retention in employment or any promotion or other incident or advantage of employment because of any obligation as a member of a reserve component of the Armed Forces of the United States.

■ It is not disputed that the provisions of the Act, if applicable, must take precedence over contrary terms in the Contract, because "no practice of employers or agreements between employers and unions can cut down the service adjustment benefits which Congress has secured the veteran under the Act." Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 285, 66 S.Ct. 1105, 1111, 90 L.Ed. 1230, 1240 (1946).

The controlling principles of construction which must be applied in interpreting the provisions of the Act were established by the decision in *Fishgold*.[6] There, Mr. Justice Douglas stated:

\* \* \* The Act was designed to protect the veteran in several ways. He who was called to the colors was not to be penalized on his return by reason of his absence from his civilian job. He was, moreover, to gain by his service for his country an advantage which the law withheld from those who stayed behind. \* \* \* [The returning veteran] does not step back on the seniority escalator at the point he stepped off. He steps back on at the precise point he would have occupied had he kept his position continuously during the war. \* \* \* \* \* \* This legislation is to be liberally construed for the benefit of those who left private life to serve

---

**6.** The Court in *Fishgold* was interpreting provisions of the Selective Training and Service Act of 1940, which were re-enacted in substantial part in the Universal Military Training and Service Act of 1948 and the Military Selective Service Act of 1967.

their country in its hour of great need. * * * Our problem is to construe the separate provisions of the Act as parts of an organic whole and give each as liberal a construction for the benefit of the veteran as a harmonious interplay of the separate provisions permits. *Fishgold, supra* at 284, 285, 66 S.Ct. at 1110.

Congressional purpose is found in 50 U.S.C. App. § 459(c)(2), which provides as follows:

It is declared to be the sense of the Congress that any person who is restored to a position in accordance with the provisions of paragraph (A) or (B) of subsection (b) [of this section] should be so restored in such manner as to give him such status in his employment as he would have enjoyed if he had continued in such employment continuously from the time of his entering the armed forces until the time of his restoration to such employment.

An analysis of the specific provisions involved in the case at bar must be undertaken within the framework of liberal construction created by the provisions of § 459(c)(2) and the decision in *Fishgold, supra*.

■ Courts ruling upon parts of the Act pertinent to the instant litigation have consistently held that the statute affords two general areas of protection to the returning veteran:

(1) "seniority, status, and pay;"

(2) "insurance and other benefits." Hoffman v. Bethlehem Steel Corporation, 477 F.2d 860 (3d Cir. 1973). "Seniority, status, and pay" are protected by § 459(b)(B)(i), which requires restoration to the former position occupied by the returning veteran, or to a position of "like seniority, status, and pay," and by § 459(c)(1), which requires restoration "without loss of seniority." "Insurance and other benefits" are protected by § 459(c)(1), which requires participation "in insurance or other benefits offered by the employer pursuant to established rules and prac-

tices relating to employees on furlough or leave of absence in effect with the employer at the time such person was inducted into such forces." *The "insurance or other benefits" clause was intended to add certain protections to the veteran and not to subtract from those benefits which are granted in § 459(b)(B) and other clauses of § 459(c).* Hoffman v. Bethlehem Steel Corporation, *supra,* at 862. Accardi v. Pennsylvania R. Co., 383 U.S. 225, 232, 86 S.Ct. 768, 773, 15 L.Ed.2d 717, 722 (1966).

■ Thus the scope of these two areas of protection differs. "Seniority, status, and pay" are protected by the escalator principle described by Justice Douglas in *Fishgold.* Protection as to insurance or other benefits is more limited because the statute by its terms merely prohibits discrimination between those employees in military service and other employees who are on furlough or leave of absence. If the employer has "established rules and practices" with respect to insurance or other benefits, and these rules are applied evenhandedly to employees who leave active employment to enter military service, as well as to those who take leaves of absence or furloughs for other reasons, then the standard mandated by this clause of § 459(c)(1) has been met. See Accardi v. Pennsylvania R. Co., *supra,* 383 U.S. at 231, 232, 86 S.Ct. 768, and Hoffman v. Bethlehem Steel Corporation, *supra,* 477 F.2d at 862, 863.

Thus, resolution of this matter turns upon the characterization which is given to the insurance coverage continuation sought by Dufner. Penn Central contends that the "insurance or other benefits" clause is controlling in this situation, and maintains that Dufner upon his return from military service was treated in the same manner as any employee who had rejoined the company after a furlough in excess of four months duration. In each case the Contract requires a waiting period without insurance coverage until the first day of the calendar month following the return to service. Since there was no discrimi-

nation between the two classes of returning employees, Penn Central contends that the requirements of § 459(c)(1) have been satisfied.

Plaintiff Dufner, on the other hand, contends that continuation of the insurance coverage is controlled by the seniority provisions of § 459, which require immediate restoration upon his return to employment, without regard to the treatment afforded to employees returning from civilian leaves of absence and furloughs. Dufner cites the broad language of the Supreme Court in Oakley v. Louisville & N. R. Co., 338 U.S. 278, 283, 70 S.Ct. 119, 122, 94 L.Ed. 87, 91 (1949), in which the Court said:

> * * * [A]n honorably discharged veteran, covered by the statute, was entitled by the Act to be restored not to a position which would be the precise equivalent of that which he had left when he joined the Armed Forces, but rather to a position which, on the moving escalator of terms and conditions affecting that particular employment, would be comparable to the position which he would have held if he had remained *continuously in his civilian employment.* (emphasis supplied)

Dufner also refers to similar language in § 459(c)(2):

> (2) It is declared to be the sense of the Congress that any person who is restored to a position * * * should be so restored in such manner as to give him such status in his employment as he would have enjoyed if he had *continued in such employment continuously from the time of his entering the armed forces until the time of his restoration to such employment.* (emphasis supplied)

The parties have expressly stipulated that "[i]f Plaintiff had not been required to leave his position for purposes of military service in the Armed Forces of the United States, he would have been continuously employed by the defendant and defendant would have continued to pay premiums providing Plaintiff with the aforementioned insurance coverage without interruption during the period of Plaintiff's absence in military service".[7] Hence, Dufner contends that he must be immediately restored to insurance coverage under the "continuous employment" principle.[8]

There has been a spate of litigation recently with respect to the meaning and applicability of the "seniority" and "insurance or other benefits" provisions of § 459. The law in this field has proceeded on a case-by-case basis, and it is necessary to analyze the landmark cases in depth in order to accurately assess the trends in the law.

The U. S. Supreme Court decision in Accardi v. Pennsylvania R. Co., *supra*, was the watershed case in this area and began the evolution of an expanding reach of the "seniority" clauses in connection with the rights of returning veterans.

The petitioners in *Accardi* were employees of the Pennsylvania Railroad who were discharged following settlement of a labor dispute. The employees did not contest their discharge, but claimed that the amount of the separation allowance paid to each employee should have included credit for the time

---

7. Stipulation, No. 9

8. Dufner has also argued that he is entitled to insurance benefits under Article VI (A)(1)(a)(iv) of the Contract, on the grounds that he rendered compensated service during March, the month of his return to employment, and that he could not be denied vacation pay upon his return, citing Ewert v. Wrought Washer Mfg. Co., 477 F.2d 128 (7th Cir. 1973) and Locaynia v. American Airlines, 457 F.2d 1253 (9th Cir. 1972), and apparently equating entitlement to vacation pay under the cases with receipt of vacation pay under the terms of the Contract. This contention is clearly incorrect, since Article VI(A)(1)(a)(iv) refers only to a return to employment *while insured* under the extension of coverage set out in Article VI (A)(1)(a)(i)–(iii). Dufner ceased to be so insured after the end of the fourth month following the month in which he last rendered compensated service. We therefore decline to decide the hypothetical question of entitlement to vacation pay.

spent in military service. The amount of the separation allowance was determined by the length of "compensated service" with the railroad. A month of "compensated service" was defined as any month in which the employee worked one or more days, and a year of compensated service was defined as twelve such months or a major portion thereof. When the railroad computed the petitioners' separation allowances it did not include the years spent in the armed forces as "compensated service". The Supreme Court held that failure to include the years spent in military service violated the petitioners' rights to be re-instated "without loss of seniority", as guaranteed by the Selective Training and Service Act of 1940.[9]

Mr. Justice Black, speaking for a unanimous Court, discussed at length the concept of "seniority" as it is used in the Act.

> The term "seniority" is nowhere defined in the Act, but it derives its content from private employment practices and agreements. This does not mean, however, that employers and unions are empowered by the use of transparent labels and definitions to deprive a veteran of substantial rights guaranteed by the Act. * * * The term "seniority" is not to be limited by a narrow, technical definition but must be given a meaning that is consonant with the intention of Congress as expressed in the 1940 Act. That intention was to preserve for the returning veterans the rights and benefits which would have automatically accrued to them had they remained in private employment rather than responding to the call of their country. In this case there can be no doubt that the amounts of the severance payments were based primarily on the employees' length of service with the railroad. The railroad contends, however, that the allowances were not based on seniority, but on the actual total service rendered by the employee. This is hardly consistent with the bizarre results possible under the definition of "compensated service." As the Government points out, it is possible under the agreement for an employee to receive credit for a whole year of "compensated service" by working a mere seven days. There would be no distinction whatever between the man who worked one day a month for seven months and the man who worked 365 days in a year. The use of the label "compensated service" cannot obscure the fact that the real nature of these payments was compensation for loss of jobs. And the cost to an employee of losing his job is not measured by how much work he did in the past—no matter how calculated—but by the rights and benefits he forfeits by giving up his job. Among employees who worked at the same jobs in the same craft and class the number and value of the rights and benefits increase in proportion to the amount of seniority, and it is only natural that those with the most seniority should receive the highest allowances since they were giving up more rights and benefits than those with less seniority. The requirements of the 1940 Act are not satisfied by giving returning veterans seniority in some general abstract sense and then denying them the perquisites and benefits that flow from it. We think it clear that the amount of these allowances is just as much a perquisite of seniority as the more traditional benefits such as work preference and order of lay-off and recall. * * * *Accardi, supra,* 383 U.S. at 229, 230, 86 S.Ct. at 771. (footnote omitted)

The respondent railroad had argued that the separation allowances did not fall within the "seniority" provisions of the Act, and the Court of Appeals so held. The Supreme Court disagreed:

> What we have said makes it unnecessary to discuss in detail the Court of

9. These provisions are now contained in 50 U.S.C. App. § 459.

Appeals' holding that these allowances did not come within the concepts of "seniority, status, and pay" and thus were governed not by § 8(b)(B) and the part of § 8(c) relating to seniority but rather by the clause in § 8(c) stating that returning veterans "shall be entitled to participate in insurance or other benefits offered by the employer pursuant to established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time such person was inducted into such forces . . . ." The Government contends that the "other benefits" clause of § 8(c) was added to the bill "for the express purpose of entitling employees to receive, while in service, such benefits as their employers accorded employees on leave of absence." The legislative history referred to in the Government's brief persuasively supports such a purpose.

This argument of the Government—that the "insurance or other benefits" clause was put in to provide these company benefits for the serviceman at the time he was in the armed forces—also finds some support in the fact that § 8(c) provides that the serviceman would be entitled to these benefits only if they were "in effect with the employer at the time such person was inducted into such forces . . . ." Without attempting in this case to determine the exact scope of this provision of § 8(c) it is enough to say that we consider that it was intended to add certain protections to the veteran and not to take away those which are granted him by § 8(b)(B) and the other clauses of § 8(c). *Accardi, supra,* at 231, 232, 86 S.Ct. at 772. (footnote omitted)

The *Accardi* decision was discussed by Professor Archibald Cox in an article in the Harvard Law Review in 1966. Professor Cox theorized that *Accardi* was clearly a turning point in judicial interpretation of the seniority provisions of the Act.

In Fishgold v. Sullivan Corp., the Supreme Court announced the "escalator principle": a veteran's seniority was not frozen during his period of military service; instead, he was entitled to return to his former employer with the seniority he would have attained but for his military absence. The escalator principle has consistently been applied to those advantages which accrue to an employee solely on the basis of time spent in the service of the employer, including preferences with respect to layoffs, choice of jobs, pay increases, vacations, and automatic promotions. But most courts refused to apply the principle to fringe benefits. They held that such benefits were not part of "seniority, status, and pay" because the "other benefits" clause of the statute operated as a limitation; returning veterans were entitled to participate in fringe benefits only to the extent that other employees on furlough or leave of absence were allowed to do so. *Accardi* clearly overrules those cases which relied on the "other benefits" provision to exclude certain employee benefits from the scope of the statute's "seniority" requirement. Mr. Justice Black stated that the purpose of the "other benefits" clause was to "add certain protections to the veteran" rather than to take away benefits conferred by other provisions of the Act. Thus, *Accardi* suggests that the standard for determining what is encompassed by the term "seniority" is independent of the other provisions of the Selective Service Act. Cox, "The Supreme Court, 1965 Term", 80 Harvard L.Rev. 91, 148 (1966). (footnotes omitted)

Thus, Accardi gave birth to the crucial concept which Professor Cox delineates as the "independence" of the Act, and the proposition that the "insurance or other benefits" clause, rather than limiting the seniority provisions, instead creates a separate and specific protection which is to be accorded to the returning veteran.

The difficulty which the lower courts have experienced in applying the rule of the *Accardi* case is illustrated in the litigation which reached the Supreme Court in the case of Eagar v. Magma Copper Co., 389 U.S. 323, 88 S.Ct. 503, 19 L.Ed. 2d 557, reh. den. 389 U.S. 1060, 88 S.Ct. 767, 19 L.Ed.2d 866 (1967). The petitioner in the *Eagar* case was first employed by Magma Copper Company on March 12, 1958, and terminated the employment in order to enter military service on March 6, 1959, just short of one year after he was hired. He was honorably discharged, and returned to Magma on May 2, 1962. The company denied him vacation pay for the work year following March 12, 1958, and denied him two paid holidays in the year following his return to work. The collective bargaining agreement in force between the employer and petitioner's union granted paid vacations at the end of the work year, if the employee had worked 75% of the shifts available to him and was employed on the anniversary date marking the completion of his first year of employment. Petitioner had worked 75% of the shifts available to him from March 12, 1958 to March 12, 1959, but because he was not employed by the company on the anniversary date, March 12, 1959, his claim for vacation pay was denied. The collective bargaining agreement also required that employees be on the payroll for three months continuously before any paid holiday, and petitioner's claims for paid holidays on Memorial Day and Independence Day in 1962 were similarly denied.

The district court granted the relief sought by the employee. The Court of Appeals for the Ninth Circuit reversed and dismissed the action. Magma Copper Company, San Manuel Division v. Eagar, 380 F.2d 318 (9th Cir. 1967). The Court of Appeals found that the vacation and holidays sought by Eagar were not perquisites of seniority, but fell under the heading of "other benefits", and reasoned that because they were not granted in such manner as to discriminate between veterans and non-

veterans, there was no violation of the Act. The U. S. Supreme Court decision in *Accardi* was rendered after the Court of Appeals decision in the *Eagar* case, and the employee petitioned the Court of Appeals for a re-hearing in line with the principles enunciated in *Accardi*. The petition was denied, with the Court of Appeals holding that *Accardi* was not concerned with the type of "fringe benefits" involved in *Eagar*. Judge Madden dissented on the denial of re-hearing, in a brief opinion which turned out to be prescient of the ultimate decision of the Supreme Court. With regard to the distinction between "seniority" and "fringe benefits", Judge Madden wrote:

I gather from the Supreme Court's opinion in Accardi that the distinction which the Court of Appeals made in Accardi, and which this court makes in the instant case, between "seniority, status and pay" on the one hand and "fringe benefits" on the other does not seem very vital to the Supreme Court. The issue seems rather to be whether the rights and benefits claimed by the employees "would have automatically accrued to them had they remained in their civilian jobs" instead of entering the military service. Magma Copper Company, San Manuel Division v. Eagar, *supra*, 380 F.2d at 322.

When the *Eagar* case reached the Supreme Court, the Court of Appeals was reversed in a per curiam decision without opinion, on the authority of *Accardi*. Justices Douglas, Harlan, and Stewart dissented, on the ground that the "other benefits" clause was controlling. Eagar v. Magma Copper Company, *supra*.

We have discussed at length the procedural history of the *Eagar* case because the limits of that decision are extremely relevant to the present case. It was arguable, before *Eagar*, that the rule of *Accardi* applied only to those employment factors which were related to, and increased with, the *length of a given employee's service*. In *Accardi*, the separation allowances were based on a formula which produced an increasing al-

lowance with the length of service. This interpretation is in accord with the garden variety usage of the term seniority, defined in Webster's New International Dictionary of the English Language, 2d Edition, as "the status secured by length of service for a company, to which certain rights, as promotion, attach." But the vacation and holiday privileges in *Eagar* were not related to length of service in employment. As Justice Douglas wrote for the dissenters in *Eagar*:

> * * * No employee of Magma, it appears, regardless of how long he has been with the firm, gets paid vacation if he is not on the payroll on his work-year anniversary date. No employee gets a paid holiday unless he has been with Magma for the three preceding months. * * * Eagar v. Magma Copper, *supra*, 389 U.S. at 325, 88 S.Ct. at 504.

The employee in *Eagar* was denied a paid vacation because he had not been employed by the company on a single date, March 12, 1959. He was denied paid holidays because he had not been on the company payroll for three consecutive months prior to the holidays. In each case, the company sought to impose the equivalent of a "compensated service" requirement in order to qualify for the benefit withheld. In each case, the Supreme Court held, on the authority of *Accardi*, that the Court of Appeals had been in error when it upheld the benefit limitations of the collective bargaining agreements.

The cases which followed the Supreme Court decision in *Eagar* can be rationalized by the following approach to the seniority problem now before this Court. In essence, these cases have upheld a "compensated service" requirement if it is in fact tied to a substantial quantum of work, as contrasted to mere presence on the payroll upon a given date or for a short period. If the "compensated service" requirement can be satisfied by employment for a period which is truly de minimis in relation to the work year— seven days in *Accardi*, and a single day

for a paid vacation in *Eagar*—the courts will extend the seniority protection of the Act to the returning veteran, even though a returnee from a non-military furlough could be denied the benefits in question.

In Hollman v. Pratt & Whitney Aircraft, 435 F.2d 983 (5th Cir. 1970), the employees were denied vacation pay for the sole reason that they were not on the employer's active payroll on December 31 of the work year, and did not return to the company's active payroll during the immediately following work year— an absence necessitated by military service. Since the benefits would have been granted had the employees been on the payroll for a single day—either December 31 of the work year, or any day of the year immediately following—the Court held that these benefits were protected under the holding in the *Eagar* case.

Judge Thornberry wrote:

In these times of relatively high wages and steep income taxes, unions bargain vigorously for indirect compensation in the form of a host of diverse benefits. Whether the benefits are elements of "seniority" or "other benefits," the veteran's stake in them must be protected if they would automatically accrue to him but for induction. Clearly, the exclusion of veterans from benefits that have come to be regarded as essential perquisites of employment is inconsistent with the Universal Military Training and Service Act. * * * *Hollman, supra,* 435 F.2d at 989 (footnote omitted)

The Court's test in *Hollman* is "*automatic accrual but for induction*", a test which would include benefits beyond those which increase with length of service, and beyond the dictionary definition of seniority. The vacation and holiday pay benefits in *Eagar* and *Hollman* were granted or denied based upon a *condition of eligibility* which was easily fulfilled by employees who stayed on the job, but impossible to be fulfilled by employees who were inducted into the armed forces. The conditions of eligi-

bility were so easily fulfilled by those not inducted that they were for all practical purposes "automatically accrued but for induction", and were thus protected by the provisions of the Act.

The limits of the "automatic accrual" test were suggested in the case of Kasmeier v. Chicago, Rock Island and Pacific Railroad Co., 437 F.2d 151 (10th Cir. 1971). The collective bargaining agreement in *Kasmeier* required that an employee render 110 days of compensated service in the previous calendar year in order to qualify for a vacation. The plaintiff, a returning veteran, rendered only 53 days of compensated service in the year in question due to his absence in the armed forces. The Court held that under these facts plaintiff was not entitled to vacation benefits. The 5th Circuit decision in *Hollman* was distinguished:

> * * * Although the result [in *Hollman*] is contrary to the instant decision, it is the variant facts of the case, not the inconsistent rationale, which creates the differing outcome. For even under our decision Hollman would have prevailed. There the claiming parties had met all the requirements for vacation benefits in the year of their induction except for one requiring them to be in the employment of the company on the final day of the subject calendar year. With the facts so closely akin to the Magma Copper case, the court ultimately made that case the basis for their decision. The only incongruency between the Fifth Circuit and the decision of the instant case rests on the interpretation of the Accardi case insofar as it either shades or erases the line between "seniority" and "other benefits." We continue to perceive a significant distinction between those cases in which benefits would automatically accumulate with the passage of time, such as Hollman's situation,

and those cases in which more than a duration of time is required to collect the rights, such as Kasmeier's situation. On the facts of the case before us, we believe the distinction to be valid. Accordingly, Kasmeier's claim must be denied. *Kasmeier, supra,* 437 F.2d at 155, 156

The rationale of *Kasmeier* was followed in Foster v. Dravo Corporation, 490 F.2d 55 (3d Cir. 1973), a recent case in the U. S. Court of Appeals for the Third Circuit. In that case Judge Adams interpreted the collective bargaining agreement as requiring twenty-five full work weeks in order to receive vacation benefits, and concluded that employees who had failed to substantially comply with this requirement were not eligible to receive the benefits. The Court noted that vacation benefits are a form of deferred compensation for work actually performed, and held that it was not inconsistent with the underlying purposes of § 459 to require the employee to fulfill the work requirement, at least where such a requirement is not de minimis.

■ The teaching of *Eagar, Hollman, Kasmeier,* and *Foster* is clear. If the compensated service requirement is nominal (one day in the case of the *Eagar* and *Hollman* vacation benefits), or relatively insubstantial, the benefits are held to automatically accrue with the passage of time and are protected. If, on the other hand, the compensated work requirement is substantial (110 days in *Kasmeier,* 25 work weeks in *Foster*), then, because something more than the mere passage of time is required for eligibility, the benefits will not receive the protection of the Act.[10]

No precise formula or fixed period of time is mandated by the decided cases. In each instance, the Court will look to what Mr. Justice Black termed the "real nature" of the benefits. *Accardi, supra,* 383 U.S. at 230, 86 S.Ct. 768.

---

10. See also the recent case of Young v. Southern Pacific Transportation Company, C.D.Calif., Civil No. 73–444–RJK (September 24, 1973), where *Kasmeier* was followed as to a vacation requirement of 160 days service in the preceding calendar year and 320 days service in the two preceding years.

In the instant case, we find a "compensated service" requirement which could be satisfied by employment for a single day or indeed even. for a single hour.[11] Had Dufner returned to compensated service at any time during February of 1969, a premium would have been payable under the contract beginning March 1, 1969, and he would have been covered by the policy when the accident occurred. Dufner was unable to render compensated service during the month of February only because of his service in the armed forces, after which he made timely application for re-employment with Penn Central.[12]

Thus, the "compensated service" requirement in the case at bar was so easily fulfilled as to "accrue automatically but for induction". *Hollman, supra,* 435 F.2d at 989. As noted previously, all parties expressly stipulated that if Dufner "had not been required to leave his position for purposes of military service in the Armed Forces of the United States, he would have been continuously employed by defendant and defendant would have continued to pay premiums providing plaintiff with the aforementioned insurance coverage without interruption during the period of plaintiff's absence in military service." [13] Based upon the operative facts of this case, we conclude that the controlling. factors are those enunciated in *Eagar, Hollman, Kasmeier,* and *Foster, supra.*

Admittedly, the result in this case is superficially anomalous. An insurance benefit is not treated under a section of the Act that expressly refers to "insurance or other benefits", but is considered instead as a perquisite of seniority entitled to the broader protection which the Act affords to this class of benefits. The inconsistency, however, is more apparent than real. The Act does not create two mutually exclusive classes, one labeled "seniority" and the other "insurance or other benefits". A particular insurance benefit may be considered as either a perquisite of seniority or as an "other benefit", depending on the facts of a given case.[14] The *Accardi* case definitively declared that the "insurance or other benefits" clause was intended to give additional protection to the returning veteran, and not to take away, define, or limit the protection of the seniority clauses. If a particular benefit is considered one of seniority, the full protection of the seniority clause is extended. If it is not considered part of seniority, the "insurance or other benefits" clause at least ensures that the returning veteran will be treated in the same manner as an employee returning from a non-military leave of absence or furlough.[15]

We therefore conclude that Dufner was entitled to coverage under Group Policy No. GA–23,000 immediately upon his return to employment with Penn

---

11. Article IV of the Contract requires a premium payment with respect to each Qualifying Employee "who rendered compensated service to or received vacation pay from a signatory Employer in the preceding calendar month." The amount of "compensated service" is not specified.

12. 50 U.S.C. App. § 459(b) permits 90 days for re-application.

13. Stipulation, No. 9.

14. It is clear, for example, that an insurance benefit which increased with length of service would have been considered as a perquisite of seniority even before the decision in *Eagar.* Defendant appears to concede this point on p. 13 of its Supplemental Brief.

15. It appears that Congress at least tacitly approves of the interpretation placed on § 459 by the federal courts. Six years have elapsed since the Supreme Court denied rehearing in the *Eagar* case on January 15, 1968. On August 17, 1968, Congress amended § 459 by adding subsection (c)(3), which gave protection to employees who were members of reserve components of the armed forces, and made changes in subsections (d), (g)(1), and (g)(2). Pub.L. 90–491, § 1, 82 Stat. 790. Congress further amended § 459 on September 28, 1971, making a technical change in subsection (j). Pub.L. 92–129, Title I, § 101(a)(23), 85 Stat. 351. Neither the 1968 nor the 1971 amendments made changes in the "seniority" or the "insurance or other benefits" sections of § 459.

Central, and that benefits must be paid for medical expenses incurred as a result of the accident which occurred during March of 1969. Accordingly, the motion for summary judgment of defendant Penn Central will be denied, the motion for summary judgment of plaintiff Francis X. Dufner will be granted, and judgment will be entered for plaintiff under Rule 58 of the Federal Rules of Civil Procedure in the amount of $828.35.